is United States v. Perrault, docket 19-2184. And Mr. Eisenheimer, we'd be pleased to hear your argument when you're ready. Thank you, your honor. May it please the court, counsel, my name is Eric Eisenheimer. I represent Mr. Perrault in this matter. Mr. Perrault is entitled to a new trial for three specific reasons. First, the district court abused its discretion by admitting seven propensity witnesses under Rule 413 and 414. Second, the jury instructions in this case were overbroad, lax specificity, and deprived Mr. Perrault of his right to a unanimous jury verdict as to each count. And third and last, Mr. Perrault, the cumulative nature of those errors, as well as the denial of a motion to continue, and additional errors that I'll discuss, deprived Mr. Perrault of his right to a fair jury trial under the Sixth Amendment. Let me begin with the court's introduction of seven propensity witnesses under Rule 413 and 414. The district court's decision to admit, to allow the introduction of those seven propensity witnesses was an abuse of discretion because doing so is manifestly unreasonable. Rule 413 and 414 are subject to the Rule 403 balancing test, and the specific problem, the specific error the district court made in this case is failing to assess or failing to apply the law of diminishing returns as to each successive propensity witness. So what if the court would have said five propensity witnesses, would you be satisfied that wasn't an abuse? I don't know that there's a specific number of witnesses where one number would be fine and the other would have been erroneous. I think the proper analysis at this point is to assess whether or not the court engaged in the proper 403 analysis. And to address your question, let's say that the court deemed that the first witness, the probative value of that witness was not substantially outweighed by the danger of unfair prejudice. Then what the court failed to do is assess the next witness and each successive witness as to the diminished probative value each of those successive witnesses would have. So if the first witness, witness one, had probative value as to an evidentiary proposition, the next witness and the successive witnesses after that would have diminished probative value as to that evidentiary proposition. Did you make this argument the district court? The trial counsel in this case made the argument that there were certain witnesses in this case that if brought in in combination with the other witnesses would essentially guarantee that Mr. Peralta would be found guilty. I can't remember his exact words, but he identified that bringing in specifically trial counsel identified John Doe's two, four, seven, and eight. John Doe four, I don't believe was a witness in the case, so that's not relevant at this point, but he identified John Doe's two, seven, and nine as the witnesses that whose probative was substantially diminished and whose probative value was substantially outweighed by the danger of unfair prejudice and said and specifically identified if brought in, these witnesses would guarantee that Mr. Peralta would be found guilty. And that's what happened. It's that unfair prejudice of bringing in seven propensity witnesses. Was one of those known, John Doe, the one who filed the civil lawsuit? I'm sorry, Your Honor. Was two, seven, or nine one of the witnesses that was publicly known prior to trial? I don't know. I believe one of them at least filed a civil lawsuit. I'm not sure if they were publicly known or not. Bringing in those witnesses, what I would like to focus on is the danger of unfair prejudice. Judge Phillips, your question was about what is the appropriate number, and I don't know that there's an answer at this point because we have to first ascertain the proper analysis under Rule 403, and part of that analysis is identifying the undue prejudice that can arise out of this number of witnesses. In a trial involving sexual assault allegations or any type of assault allegation, particularly sexual assault or sexual abuse, the fundamental defense is going to the veracity of the alleged victim in this case, who is John Doe one, and identifying and the potential that that witness has to fabricate or to make a false allegation. In this case, that was the defense, and the defense focused on the fact that John Doe one brought a civil lawsuit, that there was a financial incentive, and again, that's why Congress adopted rules that provide the prosecution a way of establishing propensity, but that propensity evidence is still subject to the 403 balancing, and in a case like this where you have such a high number of propensity witnesses, it overwhelms the defense's ability to establish a basis to attack the credibility of, in this case, John Doe one, the alleged victim, the named victim, alleged victim in the indictment. That ability to mount a defense, to challenge the veracity and credibility of the named alleged victim, was overwhelmed by the number, by the seven propensity witnesses that were brought into this case. The very length that the government spent addressing those propensity witnesses, I think, highlights the risk that that type of cumulative evidence poses to the defendant's ability to put on a defense. In this case, looking at the trial, the seven propensity witnesses took up over half of the time the government, of the government's case in chief. So the trial, over half of the trial was spent on witnesses who were there only for a propensity purpose, and that highlights that in cases like this, where there's not a cap, where there's not a adequate analysis under Rule 403, it renders the trial, it renders the trial, not a trial on the merits of the indictment, but it renders the trial, and I don't want to be hyperbolic in saying this, but I think that it's absolutely accurate in a case like this. It renders the trial a character assassination on the defendant, because we have a trial where the majority of the government's case in chief is spent on 413, 414 propensity witnesses. How many, how many witnesses would you be satisfied with? I mean, can they call two? I mean, at some point, I mean, because I was thinking about this as you were talking to Judge Phillips, I think to myself, okay, you have three witnesses that you're primarily didn't, didn't want to testify, and that was the, really the thrust of the argument below, where, with respect to these three witnesses, and so you say, okay, well, let's shave off those three witnesses. Would, would you be making this same argument if there were only four that testified below, and they took up, instead of a half, they took up three-eighths of the time of the trial? Your Honor, again, I don't, I, I don't know what the, the exact number of appropriate witnesses in a case like this is. It's certainly not the three witnesses the trial counsel identified, plus, uh, the other four witnesses. Perhaps it's four, perhaps it's three, perhaps it's two, but again, what, what, what we're looking at is not two or three or four, we're looking at seven that took up over half the trial. Let me ask you about that. The, when you say half the trial, that, that's somewhat jarring, but there's another variable, right, which is how long the trial lasted, and it's not as though the jury withstood a two-week barrage from these seven John Doe's. Instead, it was far less than that, right, and isn't that proper consideration for the court? Your Honor, I misspoke. I meant half the government's case in chief. I didn't mean half the trial. I apologize. I meant to say that as well. Um, so I think in the context of this trial, I can't recall exactly how many days the trial was. I think it was a six-day trial. Um, but over, but if, if we're looking at the government's case in chief and half of that is spent on a barrage of 413, 414 character witnesses, making allegations going back, not just around the time of the, uh, of the incident alleged in the indictment, which is 1991, 1992. We're talking about character witness, uh, propensity witnesses going back to the 80s, the 70s, even to the late 60s. We're talking about witnesses essentially going back half a century, and that type of evidence repeated over and over again has the tendency to invite the jury to make a decision on an improper basis. And as the rules recognize that improper basis is typically an emotional one. That's precisely what happened here. So it's not just a cold calculation of what's the appropriate number of witnesses or how much of the trial do we want taken up? It's a calculation of did the, this number of witnesses, did it invite the jury to make a decision on an improper emotional basis? And in this case, I think it's clear that it did invite the jury to make a decision on an improper emotional basis. We have with that number of witnesses taking up that much time in trial, the jury is inevitably going to be distracted by that just overwhelming amount of evidence. And that overwhelming amount of evidence is going to, is going to precisely do that overwhelm the defense's ability to appropriately put on the defense as the defense is guaranteed under the due process clause of the fifth amendment and the sixth amendment right to a jury trial. That risk of inviting the jury to make a decision on an emotional basis was highlighted in the government's closing argument for two of the witnesses. I believe it's John Doe six, it may have been John Doe five, but I believe John Doe six and John Doe seven, the government highlighted how for John Doe six, um, that individual had suffered, um, the emotional suffering trauma they had suffered that they, uh, they were unemployed. They still lived with their mother for John Doe seven, the government highlighted the trauma that that individual had suffered that type of appeal to the jury's emotions with, uh, in the context of rule, these propensity witnesses does exactly what rule four or three is designed to prevent. And that's, was there an objection to, to those arguments that you just brought up? There was not your honor. I'm highlighting them, right? Go ahead. I'm highlighting them because it identifies the emotional nature of these particular, uh, propensity witnesses. So, and in addition to that, the government referred to those witnesses. These are propensity witnesses as victims in the closing argument that again, highlights that these were not just individuals there to establish a particular evidentiary proposition, which was what the rules designed are designed to have them do. They were there to overwhelm the jury's sympathies and negate any potential defense in this case to identify problems with the veracity or, um, motivations of the named alleged victim to fabricate. In evaluating the 403, the unfair prejudice, is it a fair consideration? In other words, should we consider also as part of that equation, the defendant's own admissions about this sort of conduct? It seems like it would be more unfairly at not a competent place. I think that's an appropriate part of the consideration, but that goes to only certain of the witnesses dating back years. And I still think that the rule, and that may be relevant to the consideration of those particular witnesses under 403. But again, the, I think that would lead to a calculation where we would have diminishing propensity, diminishing marginal returns, that there is less probative value after we hear from the witnesses where there may have been an admission by the defendant. Your honor, I would like to reserve my remaining one minute and 45 seconds for rebuttal. Very well. Thank you. Mr. Sullivan, please proceed when you're ready. Yes, your honor. May it please the court. I'd like to, um, begin by saying that the court should affirm the verdict and the sentence and jump right into this discussion of 413 and 414 evidence that you've been having with Mr. Elsenheimer. Of course, on appeal here, we're reviewing this for abuse of discretion, whether Judge Vasquez abused her because there's no quabbles with the relevance of this evidence is whether the evidence was admissible. And it should be admissible unless the danger of unfair prejudice substantially outweighed the probative value. That's what we really need to examine here. And we need to examine it based on Judge Vasquez's very thorough record. Not only did she conduct a full day's and explained her decision and then followed up with a thorough written decision that in detail analyzed each of the NJD factors that the Tenth Circuit has said are the relevant considerations here and gave an explanation for how she was applying those. So on that thorough record, it's hard to find abuse of discretion, but let's get into it of weighing probative value against danger of unfair prejudice here. I submit to you that each one of these seven other John Doe witnesses, the propensity witnesses, as Mr. Elsenheimer describes them, had important value each and of themselves. And it's worth pointing out at below, during the hearing, during the briefing of this case before Judge Vasquez, trial counsel never asked for the kind of thing that appellate counsel was asking for here, which is specific findings about each John Doe witness and their propensity value standing alone, or this idea of diminishing returns. But when we talk about probative value, we need to talk about what issues there were at the trial level. And here to start off, the defendant, Arthur Perot, categorically denied ever abusing John Doe at all and through defense counsel, aggressively attacked the credibility of John Doe on a number of points. Now, Perot admitted in his conversation with the FBI, in his statement that he knew John Doe one, he knew him as an altar boy and he said that he gave him gifts and offered an innocent explanation for giving him those gifts and for his association with him at that time. So, let's take gifts, for example, and why I think we had six other John Doe witnesses who talked about gift giving. Well, the defense had made a specific point of saying that the gifts to John Doe served innocent purposes. So, six witnesses that come along then and say that the gifts went to grooming for sexual abuse becomes all the more relevant. Another thing here is as part of the defense articulated by Perot, he said he did not go to Kirtland Air Force Base during the time of the charged offenses in the indictment. Well, any other John Doe witness who says that they went to Kirtland Air Force Base during that time, especially those that say they were abused there, their evidence has incredible probative value. Another thing to consider about these witnesses is two of them in particular, and this is something that I mentioned during my closing argument below, was John Doe 3 and John Doe 8. Both of their testimony was corroborated by an admission from the defendant. With John Doe 3, he's the one who was abused the single time in the early 1970s, 1971, before a church service in the morning went home and told his parents and Perot wrote an apology letter to him later that day. So, there's corroboration of his abuse in the form of same thing for John Doe number 8. During the conversation with the FBI, Perot admitted abusing John Doe number 8. So, the way I spoke about it at the trial level and why it's important is that provided the jury with a baseline of truth for 3 and for 8. They had that evidence as especially reliable because there were Perot's admissions that went with it. So, when they heard that testimony and they started to apply that to how the abuse was similar to the abuse against John Doe 1, that was especially probative because when they say they were groomed in the same way and abused in the same way, it has an extra ring of truth because the admissions that go with it. So, 3 and 8 are especially probative. At the trial court level, it seemed the only real objection that the defense had to these propensity witnesses was to 2, 7, and 9. So, I want to tell you why, in particular, those 3 were probative and needed to stand on their own. Number 2, for example, he was somebody who said that he was abused at St. Bernadette's Parish. He also was someone who did not file a lawsuit. So, when you were assessing the credibility of John Doe 1, the victim of the charged offenses in this case, and he filed a lawsuit, and there was a direct attack on his credibility because he filed a lawsuit. Number 2 was important because he was also alleging abuse at the same time, or maybe a little bit earlier in time, late 80s, whereas as John Doe 1 was early 90s, at St. Bernadette's, and he didn't file a lawsuit. So, that made him credible. Also, a core of the defense had to do with whether there was a bed in a certain room of the rectory at the church at the time of the abuse of John Doe 1. John Doe witness number 2 had been not only a parishioner there, but a security guard and could speak to whether or not there was a bed there. So, that made him especially probative. That was an issue that didn't just come out first at trial, but was litigated before the trial, as you can see from the record. So, for those reasons, John Doe 2 was very important. John Doe 7 is the one who Mr. Elsenheim was talking about some of his testimony on the stand about becoming emotional and the impact in his life. I'd note again that that wasn't something that was objected to. And if you look at the record as a whole, the reason why I highlighted that in the summation is because there had been attacks on John Doe 1 because of problems he'd had in his life after the abuse. The lawsuit, the inability, the counseling, the inability to hold down a job, and an arrest. So, what I was trying to do there in highlighting the statements that John Doe 7 had made on the witness stand about how his life fell apart and he lost his faith was to show that there was another person out there who was suffering the similar effects. And that was also buttressed by the testimony of the expert witness, Dr. Gail Goodman, who talked about these survivors. But very importantly, John Doe 7 said he went to Kirtland Air Force Base with Arthur Perot, something Arthur Perot denied. And John Doe 7 said he was abused at Kirtland Air Force Base. So, that made him especially probative. On witness number 9, what that did is that painted the picture that from the time Perot arrived in New Mexico until the time he fled in 1992, from 1969 to 1992, he really never stopped abusing children. And he always had someone. So, number 9 was really probably the first in line that we know about. And he knew Perot as an authority figure, as a teacher, same way that John Doe 1 knew Perot as an authority figure. He also said he was abused in a bed, which became a contentious issue at trial. And he talked about grooming manners, like going on outings and giving gifts. So, those three witnesses that were challenged the most by the defense below are actually very, very probative. And altogether, those witnesses were certainly necessary. And the judge was well within her discretion, based on the defense that was articulated and the way she explained her reason to admit all of them into evidence. It's also worth noting here that the judge didn't give the prosecution everything it asked for. And it was careful in how it decided what would come in and what would stay out. And it was all geared towards what is similar to the abuse of John Doe 1. If the allegations that were proffered pre-trial were of the same nature as what John Doe 1 said happened to him, they were let in. If they were different, they were excluded. And there I'd point the court to pornography. The United States had made a motion to admit evidence that he had shown pornography to other victims as a grooming technique. And the court disallowed that, saying that's not something that John Doe says happened to him. Also, the court was made aware by the prosecution there were many, many other witnesses out there accusing Perot of abuse. But we're only proffering eight at the time and seven who ultimately testified. So the judge did have in mind that there had already been a winnowing down of the potential propensity witnesses at the time of trial. The rule 413 and 414 as applied in this case, it did exactly what Congress intended the rule to do. To not put a victim of sexual abuse, which often involves late disclosure, usually happens in an isolated area, often with a vulnerable victim like a child, it avoided having John Doe 1 have to go through an uncorroboratable, unresolvable swearing match with the defendant, where John Doe 1 would make the allegation and witnesses and no other physical evidence. That's why 413 and 414 exist. And they're different from rule 404B that has a stricter standard in non-sex offense cases. It's for situations just like this. Here we had old allegations. We had a victim who was credible and could stand on his own. There were a lot of strengths in his testimony, including what I thought landed his special credibility was the way he explained not only his faults later in life, but some of the embarrassment at the time where he would get blood in his underwear and he'd hide it from his parents. Those are real hallmarks of truth. So John Doe 1 was strong on his own, but here he didn't have to stand alone because there were these other witnesses. And Judge Vasquez was well within her discretion to allow them to testify here. You said it was an argument about the jury instructions being confusing to the jury from a double jeopardy standpoint. Yes. Well, I think on this point, Your Honor, it's important to remember how Perot and how the trial counsel tried this case at the trial court level. And one thing I'd point you to is the cross-examination of John Doe 1 and the overall defense. The overall defense was to categorically deny any abuse of John Doe 1. To admit that he knew him, he admitted he knew him as an altar boy to the FBI, but admit any abuse, say he didn't go to Kirtland Air Force Base, say he didn't go to the cemetery. But then on cross-examination, if the defense wanted to pick apart individual incidents, they could have developed that during cross-examination and asked more probing questions about what happened each time in the office of the chapel or in the car or by the flight line. They didn't do that. Their defense was categorical denial of all allegations, so really the details didn't matter then. And the jury instruction then makes a lot of sense. This was a jury instruction that was proposed both by the prosecution and the defense. This is something the defense asked for and the defense got. And so now to make the arguments here, there's definitely a way. It's about instruction 16 that has three counts in it, that the one, and his argument is it doesn't tell the jury because they didn't have the indictment. It doesn't tell them anything about the specific. They could use the same act for count one and count two, for example. Yes, your honor. Well, the important thing here, the record reflects that the judge read the indictment to the jury at least twice during the course of the trial. And the face of the indictment makes clear counts one and two happened at Kirtland Air Force Base, and the language of the indictment actually says on different occasions. So the jury was on notice that those were two separate events they needed to consider, and they got another jury instruction that said they needed to consider the charges individually. How many days between reading the indictment, which was at the beginning of the trial, wasn't it? How many days before the jury deliberated after that? I'd have to look. I think about a four or five day trial. So they got it at the outset of jury selection, and they got it again, I think, at the beginning. But it was also something that was mentioned in the summations of the parties. So it should have been, there should have been more recency in the jury's mind about these issues when they went back into the jury room. Also, I point out number seven was distinguishable because it happened at Santa Fe National Cemetery. So that wouldn't be confused with one and two that happened at Kirtland Air Force Base. So together with the indictment specifying that one and two were separate acts, and number seven specifying a different location, that was sufficient for the jury to know that we were talking about three different things. Thank you. In conclusion here, hindsight seems to be 20-20 for the defense. At trial, they were happy with the jury that was chosen, didn't exercise for peremptory challenge. They were happy with the jury instructions. They didn't object to the pre-sentence report and the obstruction enhancement for flight. But here, now after trial, they want to relitigate those issues and they're not properly preserved. Thank you. Mr. Elsenheimer, you have some time remaining. Thank you, Your Honor. I'd like to address the jury instruction problem in this case. With regard to instruction 16, it's regarding counts one, two, and seven, it's not just this that the specific act, alleged acts were not identified. It's that the location in the instruction is not identified as to each count. Given that the indictment had only been read to the jury before voir dire, I believe, and then at the close of voir dire, at the beginning of trial, the entire trial elapsed before the instructions were read. The indictment was not re-read again, I don't believe. The instructions don't specify location. These are as accounts one, two, three, six, and seven. There's no specification as to location. Was there in the government's closing argument? Wasn't there some specification about? There was specification in the closing argument, Your Honor. But again, the instruction itself does not specify that. And I think that's the real problem in this case. Primarily, the instructions don't Why is it not an invited error if the instruction given was the very one submitted by the defendant? Your Honor, because the party suggested that the indictment go back with the jury, and the court did not send the indictment back with the jury. I don't believe it's invited because the defense, I believe the defense and the prosecution, suggested that the indictment go back with the jury. And in light of that, I don't think it's invited error, particularly given that we have a real question about jury unanimity with these very broad, nonspecific jury instructions that are overlapping. Part of the problem, I'm sorry, I'm out of time. I apologize, Your Honor. If there are other questions from the judges? Looks like that does it. Thank you both for your very helpful arguments. The case is submitted. Thank you.